536 P.2d 697

James Lee **BOND** and **Elko Bond,**
his wife, Appellants,

v.

**CARTWRIGHT LITTLE LEAGUE, INC.,**
**an Arizona Non-Profit Corporation, Appellee.**

No. 11703.

Supreme Court of Arizona,
In Division.

June 6, 1975.

Rehearing Denied July 8, 1975.

Tupper, Rapp, Salcito & Schlosser, P. A. by Daniel R. Salcito, Divelbiss & Gage, by G. David Gage, Phoenix, for appellants.

Scoville & Hoffman, P. C. by Leroy W. Hofmann, Robbins, Green, O'Grady & Abbuhl, P. A. by John D. Lyons, Jr., Phoenix, for appellee.

CAMERON, Chief Justice.

This is an appeal by the plaintiff James Lee Bond from the granting of a motion of the defendant Cartwright Little League, Inc., for judgment notwithstanding the verdict or in the alternative granting a motion for a new trial.

We must answer the following questions on appeal:

1. Was the plaintiff Bond a gratuitous employee of the Cartwright Little League, Inc., or a volunteer and what was the duty of care owed to him by the Cartwright Little League, Inc.?

2. Did the trial judge properly grant a judgment notwithstanding the verdict?

3. Did the trial judge properly grant the motion for new trial?

4. Did the court properly deny the plaintiff's motion for additur?

The facts necessary for a determination of this motion on appeal are as follows. In the spring of 1970 the Cartwright Little League, Inc., an Arizona nonprofit corporation, through its authorized representatives, was the high bidder at an auction to purchase the stadium flood lights located at Phoenix Municipal Stadium. It was understood that the lights were sold on the poles and that the successful bidder was to remove the lights by a certain time. After the bid was accepted a written agreement for the removal of the stadium lights was entered into between Cartwright Little League, Inc., and the City of Phoenix. The agreement contained the following provision:

"2. It is understood and agreed that all said surplus stadium playing field flood lights (excluding the standards and crossarms) will be removed at purchaser's cost during the period commencing June 20, 1970 and ending June 24, 1970, said lights to be removed by qualified persons in accordance with a standard set by the Electrical Maintenance Superintendent of the City of Phoenix, to-wit: In accordance with the verbal instructions given by Mr. Joe Protis, Electrical Maintenance Superintendent of the City of Phoenix, at the auction, on April 10, 1970, the lights are required to be removed by experienced linesmen or others used to working at heights, and a minimum of three-inch wire tails shall be left for reconnections; and in compliance with all codes, ordinances and government regulations, and further shall leave the standards and crossarms in a manner acceptable to the City."

The lights were on the top of 100 foot metal poles surrounding the Phoenix Municipal Stadium. At the top of the pole there was a platform with a guard rail so that once the person climbing the pole reached the top he had a safe position from which to work. The metal pole itself contained metal steps or rungs protruding from both sides of the metal pole, said rungs commencing some eight feet off the ground. It was necessary to reach the first rung by way of a ladder and then to climb to the platform at the top of the pole where, once the platform was reached, the lights could be dismantled and lowered by a line to the ground.

The officers of the Cartwright Little League, Inc., decided to remove the lights with the help of volunteers. Mr. Raymond Roger, President of the Cartwright Little

League, Inc., testified that he asked for volunteers at a general meeting of parents in April which had been called for the purpose of selecting managers, coaches, and umpires. He announced that assistance was needed to remove the lights. Sgt. Bond did not respond to this request for help and later Mr. Roger approached Sgt. Bond asking specifically for help:

"A  Jim had just come into the ballfield through the fence from the side of the road, standing behind the grandstand and I was walking down the field and I saw Jim, so, of course, Jim has helped the league in previous projects so I walked up to Jim and I says, 'Hi, Jim', I says, 'this weekend we're going to start taking down the lights at the ballpark.' I said, 'If you—if you get a free weekend if you could come down and help us I'd be glad to have you come down.' And Jim hesitated a minute, and I says, 'Look, I'm not asking you to climb poles.' I said, 'I got people to climb the poles.' I says, 'We need more people on the ground really.'

"Q  All right.

"A  And he didn't answer. He said to the effect, 'Well, if I'm free this weekend I'll probably come down.' He didn't say yes or no."

Bond was an Air Force Master Sergeant of 22 years experience. Bond's climbing experience included once climbing a tall wooden pole in the Air Force in 1955 as well as routinely inspecting fuel tanks for the Air Force in his current job. These fuel tanks were approximately forty feet high and reached by climbing. Bond testified that after he arrived at the stadium:

"Q  Now, something I'm not clear on and I may have misunderstood your answer. It it your testimony, Mr. Bond, that someone asked you to climb the pole? Someone said, 'Mr. Bond, will you please climb up this pole?'

"A  No, sir, it was put to me more in a question, not as a—would you please climb this pole.

"Q  As a matter of fact, Mr. Bond, the question simply was from Mr. Arnold, 'Jim, or Mr. Bond, are you going to climb the pole?' That's about what it amounted to, isn't it?

"A  Yes.

"Q  No one ever asked you to go up the pole, did they?

"A  No, sir.

"Q  When you were asked whether you were going to go up the pole, you said you couldn't see any reason why not, correct?

"A  Right, sir.

\*    \*    \*    \*    \*    \*

"Q  You started to answer a question when Mr. Hofmann cut you off and sort of rephrased it a bit. When he asked you the question 'Were you under any compulsion to climb the pole'? you testified you had no orders, as if you were in the Air Force and someone were ordering you to do something, but did you feel some type of compulsion? What was your answer to that question that you started?

"A  Yes, sir, I did feel that since I had been asked to help that—and my boy was in the little league that I should do something to help, and what was needed I would try to do.

"Q  So you didn't have any military orders—

"A  No, sir.

"Q  —pushing you but you felt some sort of social pressure?

"A  Right, sir."

When Bond was three-quarters of the way up the pole to the lights, he began to feel muscle spasms in his shoulders and he decided it was best to descend. On the way down, he suddenly lost his ability to grip in his left hand and fell down the remaining forty feet.

The defendant moved for a directed verdict which was denied.

The jury was properly instructed as to contributory negligence and assumption of risk. The jury returned a verdict for the plaintiff in the amount of $100,000 and judgment was entered therein. On 14 September 1972, the trial court filed its memorandum and order reading in part as follows:

"* * * McRae, who at the time of the accident was a vice president of Cartwright, testified that he asked plaintiff if he was going to climb a pole and the plaintiff responded that he was, that 'he had done this before.' This testimony was uncontradicted.

"An inexperienced person who has obtained employment by pretending to an experience which he has not had cannot recover for an injury caused by his inexperience. Stanley v. Chicago and WM Ry. Co. (Mich.) [101 Mich. 202,] 59 N. W. 393 (1894). No one directed plaintiff to climb the pole. He did it voluntarily. He cannot now complain that Cartwright violated a duty owed to him when he represented, in effect, that he met the qualifications required by the contract for persons who were to remove the lights. Only he, not Cartwright, was in a position to know whether the representation was true.

"The motion for judgment notwithstanding the verdict must be granted.

"Where motions for judgment notwithstanding the verdict and for new trial are joined and the motion for judgment notwithstanding the verdict is granted, the court must also rule on the motion for new trial by determining whether it should be granted if the judgment is thereafter vacated or reversed. Rule 50(e), Rules of Civil Procedure. Cartwright made timely objections to three instructions given to the jury: that an employer owes an employee the duty to provide a reasonably safe place to work and to warn the employee of dangers inherent in the place of employment (Plaintiffs' Requested Instruction No. 1 as modified); that the scope of the duty to warn varies with the facts of a particular case (Plaintiffs' Requested Instruction No. 6 as modified); and that an employer has a duty to use ordinary care to protect its employees from unnecessary harm or risks in the service (Plaintiffs' Requested Instruction No. 3 as modified). The court feels that it was error to have given these three instructions because they suggested to the jury that it could hold Cartwright liable by finding that Cartwright had not provided a reasonably safe place to work, had failed to warn plaintiff of dangers inherent in the place of employment and had failed to use ordinary care to protect plaintiff from unnecessary harm or risk. * * *

"IT IS ORDERED granting the defendant Cartwright Little League's motion for judgment notwithstanding the verdict.

"IT IS FURTHER ORDERED that in the event that the order granting judgment notwithstanding the verdict is reversed, a new trial will be granted because of the error in including in the court's instructions Plaintiffs' Instructions 1, 3 and 6, all as modified.

"IT IS FURTHER ORDERED denying Plaintiffs' motion for additur."

From these orders plaintiff appeals.

## WHAT WAS THE RELATIONSHIP BETWEEN THE LITTLE LEAGUE AND BOND?

The Cartwright Little League, Inc., contends that Bond was a mere volunteer to whom a very slight duty of care was owed. See Western Truck Lines, Ltd. v. DuVaull, 57 Ariz. 199, 112 P.2d 589 (1941). On the other hand, Bond argues that he was a gratuitous employee and because a master-servant relationship existed, the Cartwright Little League, Inc., owed him a higher standard of care.

Although one is engaged in some endeavor gratuitously, he may still be a "servant" within the scope of the master-servant doctrine. Scottsdale Jaycees v. Superior Court, 17 Ariz.App. 571, 499 P.2d 185 (1972); Restatement (Second) of Agency, § 225 (1958). The two key elements for the determination of whether a gratuitous undertaking is part of the master-servant relationship are whether the actor has submitted himself to the directions and control of the one for whom the service is done and whether the primary purpose underlying the act was to serve another.

In the Arizona case of Vickers v. Gercke, 86 Ariz. 75, 340 P.2d 987 (1959), a diocese priest called for parishioners with extra time to work gratuitously in the parochial school cafeteria. Mrs. Vickers agreed to help staff the lunch counter several days a week. While working under the supervision and direction of the cafeteria manager, Mrs. Vickers slipped and fell on mashed potatoes which hadn't been mopped up. Mrs. Vickers sued. The jury could not reach a verdict and the trial court granted a judgment notwithstanding no verdict. This court held that Mrs. Vickers was a "gratuitous employee" and not a mere volunteer and the matter was remanded for trial.

Another factor to be considered in determining whether a person is a gratuitous employee or a mere volunteer is the interest of the person performing the work. In defining what a volunteer is, it is stated at 92 C.J.S. Volunteer p. 1032:

"It has been said that no definition of a volunteer can be given without qualification, since each case must be decided on its own merits. In a general sense a 'volunteer' is one who does or undertakes to do that which he is not legally or morally bound to do, and which is not in pursuance or protection of any interest; one who intrudes himself into matters which do not concern him. The word is more particularly defined as meaning one who enters into service of his own free will; one who gives his services without any express or implied promise of remuneration; one who has no interest in the work, but nevertheless undertakes to assist therein; one who merely offers his service on his own free will, as opposed to one who is conscripted. Under these definitions, a person who, although not obliged to do an act, yet has an interest in doing it, is not necessarily a volunteer."

The cases are clear that if the so-called "volunteer" had an interest in the work, then he was not a mere volunteer and does not, as a consequence, assume the risk of being injured by ordinary negligence. Pace v. Gibson, 357 Mich. 315, 98 N.W.2d 654 (1959); Green v. Market Supply, 257 Or. 451, 479 P.2d 736 (1971):

"The distinction running through all the cases is this: That where a mere volunteer—that is, one who has no interest in the work—undertakes to assist the servants of another, he does so at his own risk. In such a case the maxim of '*respondeat superior*' does not apply. But where one has an interest in the work, either as consignee or the servant of a consignee, or in any other capacity, and at the request or with the consent of another's servants undertakes to assist them, he does not do so at his own risk, and, if injured by their carelessness, their master is responsible. In such a case the maxim of '*respondeat superior*' does apply. The hinge on which the cases turn is the presence or absence of said interest. In the one case, the person injured is a mere intruder or officious intermeddler; in the other, he is a person in the regular pursuit of his own business and entitled to the same protection as any one whose business relations with the master expose him to injury from the carelessness of the master's servants. (citations omitted)" Kelly v. Tyra, 103 Minn. 176, 114 N.W. 750, 752 (1908).

We believe that the relationship between Sgt. Bond and the Cartwright Little

League, Inc., was that of a gratuitous employee rather than a mere volunteer. Cartwright Little League, Inc., set the time and place as well as the manner in which the lights were to be removed and had control over Bond's actions while he was working for Cartwright Little League, Inc.:

> " * * * The invitor, defendant Haanpaa, who expressly invited plaintiff to give a hand in loading large livestock, owes the duty to be reasonably certain that he is not inviting a person into danger and to that end shall exercise ordinary care and prudence to make the undertaking reasonably safe for the person giving assistance and to exercise due care to prevent the existence of a situation which defendant Haanpaa knew or should have known might result in injury. * * *" Chamberlain v. Haanpaa, 1 Mich.App. 303, 136 N.W.2d 32, 36 (1965).

Bond shared with Mrs. Vickers, in Vickers v. Gercke, supra, the same relationship to the employer. Neither had to volunteer, both could refuse to do what they were directed to do and quit if they did not want to perform the services suggested. Yet while they worked, albeit voluntarily, they worked under the direction and control of their respective employers and the employers owed them a duty to "provide a reasonably safe place to work and to warn the employee of dangers inherent in the place of employment." Flynn v. Lindenfield, 6 Ariz.App. 459, 433 P.2d 639 (1967).

## JUDGMENT NOTWITHSTANDING THE VERDICT

The test for determining whether a judgment notwithstanding the verdict will stand is whether the evidence, if treated in the most favorable light to the verdict, is substantial enough that reasonable men could discern facts to support the verdict:

> " * * * If there is any substantial evidence from which reasonable men could have found the ultimate facts to be such as to sustain the verdict, the motion for judgment notwithstanding the verdict should be denied. * * * (citation omitted)" In re Estate of Frick, 13 Ariz.App. 247, 251, 475 P.2d 732, 736 (1970).

What is a reasonably safe place to work can depend upon the ability of the worker as well as the premises. In the instant case there was no showing made that the Cartwright Little League, Inc., had deviated from the normal safety practices of the professional Phoenix electricians who worked on these stadium poles. The evidence was uncontroverted that cleats on shoes could not be utilized when climbing a metal pole as opposed to a wooden pole. The evidence indicates safety harnesses were not used on these poles since the harness could become entangled in the metal rungs, impede movement, and even create a danger. For the experienced lineman the poles at Phoenix Municipal Stadium were no more dangerous than any other poles a lineman usually works on and absent hidden defects known to the employer there was no duty to warn of the danger or to ascertain that the lineman could in fact climb the pole safely.

For the amateur gratuitous employee, however, the pole was a place of potential danger and was not a reasonably safe place on which he could work.

We believe there was sufficient testimony from which the jury could have found that the Cartwright Little League, Inc., violated the standards of reasonable care in:

1. failing to warn Bond of the danger in order that he could decline to work on the pole, or

2. not determining that Bond was capable of climbing the pole. Wyle v. Moore, 52 Ariz. 537, 84 P.2d 450 (1938); Flynn v. Lindenfield, supra; Arizona Lumber and Timber Co. v. Mooney, 4 Ariz. 96, 33 P. 590 (1893).

A judgment notwithstanding the verdict is designed to permit the trial court, after mature deliberation, to revise

its ruling in denying the motion for directed verdict. In re Schade's Estate, 87 Ariz. 341, 351 P.2d 173 (1960). We believe that there was sufficient evidence of negligence to go to the jury and that the trial judge would have been wrong in granting a defense motion for directed verdict. The motion for judgment notwithstanding the verdict should not have been granted.

## MOTION FOR NEW TRIAL

The trial judge in granting the motion for judgment notwithstanding the verdict also rules on the motion for new trial as required by Rule 50(c), Rules of Civil Procedure, 16 A.R.S. He granted the motion if the judgment notwithstanding the verdict should be set aside on the basis of the instructions numbered 1, 3 and 6 being erroneous. The reasons stated comply with the requirement of Rule 59(a) of the Rules of Civil Procedure, 16 A.R.S., as well as the narrow requirement of sufficiency as stated by this court in Rogers v. Mountain States Telephone and Telegraph Company, 100 Ariz. 154, 412 P.2d 272 (1966).

■ Instruction No. 1 directed the jury that James Bond was not a mere volunteer but a gratuitous employee and that as such the defendant owed the plaintiff a duty to "provide a reasonably safe place to work and to warn the employee of the dangers inherent in the place of employment." For the reasons previously stated, we find no error in this instruction.

Instruction No. 3 read as follows:

"It is an employer's duty to use ordinary care to protect its employees from unnecessary harm or risk in its service."

For the reasons stated above, we find no error in this instruction.

Instruction No. 6 read as follows:

"The scope of duty to warn varies with the facts of the particular case. It depends upon such factors as the age, intelligence and experience of the employee involved as well as the nature of the work, the danger, and the surrounding circumstances."

Again, for the reasons stated above, we find no error in this instruction. We therefore find that the trial court was in error in granting the motion for new trial.

## ADDITUR

■ The plaintiff moved for additur, see Rule 59(i), Rules of Civil Procedure, 16 A.R.S., and appeals from a denial thereof. We find no error. The question of additur is left to the greatest possible discretion of the trial court and its decision will not be disturbed on appeal except for a clear abuse of discretion:

"From what we have written, it is obvious that the test for reviewing the granting or refusing of a trial judge's adjustment of a verdict is complex and can only be solved by an ad hoc approach. Almost always when there is a conflict in the evidence, the trial judge should not interfere with what is peculiarly the jury's function, and if he does not, we will nearly always uphold him. If there is no conflict in the evidence on items that obviously were omitted from the verdict, the trial judge must adjust, and we will uphold him if he does. Behind all of these tests still stands the original doctrine—that if the verdict is supported by adequate evidence, it will not be disturbed, and the greatest possible discretion is in the hands of the trial judge. * * *" Creamer v. Troiano, 108 Ariz. 573, 576–77, 503 P.2d 794, 797–98 (1972).

The judgment notwithstanding the verdict is set aside. The order granting the motion for new trial is set aside and the matter remanded to the trial court for entry of judgment on the verdict and for such other matters as are proper and consistent with this opinion.

STRUCKMEYER, V. C. J., concurs.

HAYS, Justice (concurring).

I concur in the result.