**Larry COTTAM and Melanie Cottam, Plaintiffs,**

v.

**FIRST BAPTIST CHURCH OF BOULDER, Defendant.**

Civ. A. No. 88–S–873.

United States District Court, D. Colorado.

Feb. 5, 1991.

Neil Quigley, Quigley & Bruce, Denver, Colo., for defendant.

James E. Mitchem, Allen P. Mitchem, Denver, Colo., for plaintiffs.

## ORDER

SPARR, District Judge.

THIS MATTER comes before the Court on Defendant's Motion for Judgment Notwithstanding the Verdict; Motion for New Trial; and Motion for Amendment of Judgment filed December 7, 1990, Plaintiffs' response filed December 18, 1990, and Defendant's reply filed December 28, 1990.

## THE TRIAL

At trial, the Plaintiffs made three basic claims. The first claim alleged that the Defendants were negligent for failing to establish rules for the safe performance of the work in question, to give any instructions as to safe work practices, or to guard against the risk of injury inherent in the work. This claim further alleged that the Defendants did not provide the workers with assistance or supervision by experienced individuals, did not warn the workers of the inherent dangers of the work, did not seek to determine the competence of the workers to perform the work, and did not provide for a safe place to work.

This claim depended upon a determination by the Court that a duty existed between the Defendant and the Plaintiff, Dr. Larry Cottam. The Plaintiffs' allegation was that this duty existed by virtue of an employer/employee relationship which was implied by the facts surrounding the project undertaken by the Texas Sunday School group. Plaintiffs contended that the First Baptist Church of Boulder was the employer and Dr. Cottam was a gratuitous employee. There is no dispute that Dr. Cottam received no monetary compensation for his assistance in this bridge project.

In their second claim for relief, Plaintiffs claimed that Dr. Cottam was performing the work of an independent contractor and that the Defendant was negligent in failing to exercise care in the selection of the people used to perform this highly dangerous work. Plaintiffs further alleged in their second claim that the Defendant failed to provide appropriate precautions against a risk of injury inherent in this type of work.

In their third claim for relief, Plaintiffs claimed that Melanie Cottam, as the wife of Dr. Cottam, suffered losses of personal affection, society, companionship, and household services as a result of the negligence of the Defendant alleged in the first and second claims.

At the conclusion of the Plaintiffs' evidence, Defendant moved for a directed verdict on all of the Plaintiffs' claims.

### EVIDENCE IN THE CASE

The evidence in the case revealed that the First Baptist Church of Boulder owned a church camp site in the James Park area in the mountains west of Boulder, Colorado. This site was normally used for church activities. However, when the site was not in use for official church functions, the church allowed some individuals to use the site for a nominal fee. Robert Bruce Chambers had been a member of the First Baptist Church of Boulder before relocating to Texas. Mr. Chambers had used the church's camp for a summer vacation site for himself and his family for some time. Mr. Chambers had voluntarily paid a nominal fee for the use of the facilities which covered the expenses of consumable items such as propane. Over the years, Mr. Chambers had developed a habit of contributing time and effort to maintenance and improvements of the church camp. Mr. Chambers's projects had been totally voluntary.

Sometime in 1982, Mr. Chambers obtained permission from the church to invite his Sunday School class from the United Methodist Church of Richardson, Texas to join him on his summer vacation trips to the church camp. The members of the Sunday School class contributed the same nominal payment as Mr. Chambers. Dr. Larry Cottam, his wife, and his family were members of the United Methodist Church of Richardson, Texas and of the Pathfinder's Sunday School class. In this capacity, they accompanied Mr. Chambers to the church camp for family vacations for several years prior to the incident here at issue.

Mr. Chambers made all the arrangements with the First Baptist Church of Boulder for the annual summer vacations with his Sunday School group. The Plaintiffs had never had any contact with members of the First Baptist Church with respect to the use of the church camp. The evidence does not reveal that any conditions were imposed upon the Sunday School group from Texas for use of the church camp, save the payment of the nominal daily fee (which on the year in question was $4.00 per day per person). However, Mr. Chambers had made arrangements with the church to perform volunteer maintenance and improvement projects. The church was to advise him of projects which would be of assistance to the church. Although Mr. Chambers had performed several projects in the past, it had never been a "condition" for members of his Sunday School class to assist him in his performance of the projects. However, they had volunteered to assist him in the past.

When the 1987 trip was arranged, Mr. Chambers discussed with James Bradfield, the First Baptist Church of Boulder member who was responsible for the church camp, what projects would be appropriate for that summer's trip. Mr. Bradfield suggested that Mr. Chambers might either build a new foot bridge across the South St. Vrain Creek to replace one which had been damaged by high water or dismantle an old house trailer which was on the property. Apparently, it was at Mr. Bradfield's suggestion that the method of construction of the foot bridge project be by the felling of the dead tree across the creek as a base for the bridge. Beyond this suggestion, the First Baptist Church did not control the specifics of the project, nor did it exercise

any supervision over the project once it was commenced.

The evidence showed that the First Baptist Church was aware that Mr. Bradfield intended to enlist the members of the Texas Sunday School class to assist him in constructing the project he elected to do. Mr. Chambers, with the consensus of several members of the group, did in fact elect to build the foot bridge and the project was planned for the day in question. Dr. Cottam had plans for that day, but, because he felt he had an obligation to the group to assist, he cancelled his plans and participated in the construction project.

There was no evidence that any of the members of the Texas Sunday School class were required to participate in the project as a condition of staying at the camp or for any other reason. As a matter of fact, there is no evidence that Mr. Chambers was required to undertake the project in question. In short, this was a purely volunteer activity on the part of Mr. Chambers and the members of his Sunday School group.

The evidence was unclear regarding exactly who decided to undertake the foot bridge project, however, it was either Mr. Chambers himself or Mr. Chambers in conjunction with members of the Texas Sunday School group. Mr. Bradfield supplied a personal chain saw for the project and other additional equipment was either supplied by Mr. Bradfield or already located at the church camp. On July 21, 1987, the morning the project was to be undertaken, Dr. Cottam voluntarily cancelled his previous plans for the day and joined several others from the Texas Sunday School class as they undertook the foot bridge project. Dr. Cottam felt an obligation to the Sunday School group to assist for several personal reasons.

There is no evidence that anyone from the First Baptist Church of Boulder was present at any time during the project. There was no specific supervision of the project by any member or agent of the First Baptist Church of Boulder. The First Baptist Church of Boulder had no part in selecting the specific members of the group who participated in the project, save arguably Mr. Chambers, nor did the Defendant exercise any supervision or control over the specifics of the undertaking. Throughout the years that the Texas Sunday School group attended the camp, they were allowed almost total independence from supervision or control by the First Baptist Church of Boulder.

It is not disputed that, after consultation as to the specific methods of construction, the members of the group followed the suggestion of using the dead tree located on the south shore of the creek (on property not owned by the Defendant) as a base for the bridge. The group discussed the best method of felling the tree and undertook that project. Dr. Cottam elected to assist Chambers and the others with the actual felling of the tree, using the chain saw furnished by Mr. Bradfield. It is not alleged that any of the equipment furnished by Mr. Bradfield or the Defendant was inappropriate, poorly maintained, or otherwise causally involved in the injuries to Dr. Cottam.

The circumstances surrounding Plaintiff's injuries are very clear. He was standing near the base of the trunk of the tree operating the chain saw when the trunk finally ruptured and the tree, which was approximately 60 feet tall, fell across the stream. A series of pictures taken from upstream by a member of the Texas Sunday School group clearly depicted what occurred. The tree unexpectedly broke approximately 23 feet above the ground. After the trunk of the dead tree broke in two, the upper part of the tree, approximately 37 feet in length, was thrown back across the creek and struck Dr. Cottam, knocking him to the ground. From where Dr. Cottam was standing, his escape route was at least partially blocked. When the top of the tree fell back towards him, he was unable to retreat and was struck on the head, shoulder, and upper body. As a result of this impact, he suffered permanent injuries. There is no real dispute as to the causation or the extent of the injuries.

## DEFENDANT'S MOTION FOR DIRECTED VERDICT

**I.** As to the first and third claims for relief (the employer/employee issue), the Court observed that the question of whether or not the Defendant owes the Plaintiff a duty to act to avoid injury is one of law to be determined by the court and the court determines as a matter of law the existence and scope of the duty based upon the evidence presented. *Taco Bell v. Lannon*, 744 P.2d 43, 46 (Colo.1987). In determining the existence of a duty to a particular defendant, the court must consider the factors of risk involved, the foreseeability or likelihood of the injury as weighed against the social utility of the conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing such burdens upon defendants in these circumstances. *Taco Bell*, 744 P.2d at 46. Other considerations may also be relevant, depending upon the circumstances of each particular case. No one factor controls and the question of whether the duty should be imposed in a particular case is essentially one of fairness under contemporary standards, that is whether reasonable persons would recognize a duty to exist under the same or similar circumstances. *Taco Bell*, 744 P.2d at 46.

In assessing the duty owed in the case at bar, it was necessary for the Court to determine the relationship of the parties. Plaintiffs, in order to support their allegation of a duty owed, relied upon the existence of an employer/employee relationship between the First Baptist Church of Boulder and Dr. Cottam. Since there was clearly no conventional employer/employee relationship, Plaintiffs relied upon the existence of a "gratuitous employee" relationship. Plaintiffs relied heavily upon the case of *Bond v. Cartwright Little League, Inc.*, 112 Ariz. 9, 536 P.2d 697 (1975), a case where a little league had purchased stadium lights which it needed to remove from the Phoenix Municipal Stadium. The plaintiff, who was a parent of one of the little leaguers, was present when the lights were removed. Someone asked him if he would climb the 100 foot poles to remove the lights. Sergeant Bond proceeded up a pole, lost his grip, and fell. The court held that the plaintiff was a gratuitous employee who was invited to participate in the work under the direction of the little league.

The *Bond* case sets forth a detailed analysis of the "gratuitous employee" doctrine. The determination of whether a gratuitous employee relationship exists is based upon two key elements. First, whether the actor has submitted himself to the directions and control of one for whom the service is done. And second, whether the primary purpose underlying the act is to serve another. *Bond*, 536 P.2d at 702. The *Bond* case also indicates that Michigan, Oregon, and Minnesota have recognized a gratuitous employee doctrine. (Citations omitted).

Plaintiffs also relied upon *Marcus v. Frankford Hospital*, 445 Pa. 206, 283 A.2d 69, 73 (1971). There, a 14–year–old hospital "candy striper" fainted, fell, and injured herself when she was exposed to an unpleasant and emotionally disturbing situation. Although she received meals and some limited training, she was not employed or paid by the hospital. The court in that case found the hospital owed her a duty by virtue of a master/servant relationship.

Plaintiffs also quoted several other cases where courts based liability upon the doctrine of gratuitous employment. Plaintiffs argued that, under the circumstances of this case, the First Baptist Church owed Dr. Cottam the duty owed to an employee. Plaintiffs claim that as a result of the Defendant's breach of that duty, they suffered injuries.

The only case in Colorado which seems to address the issue is *Hall v. State Compensation Insurance Fund*, 154 Colo. 47, 387 P.2d 899 (1963). The *Hall* case concluded that workmen's compensation benefits would be payable to a gratuitous employee and would therefore bar such employee from filing a tort claim against the employer. That case was indicative of Colorado's recognition of gratuitous or volunteer em-

ployment, but beyond that it was not particularly instructive.

The Colorado Supreme Court has held that a volunteer is one who undertakes to do something which he is not legally or morally obligated to do and which undertaking is not pursuant to or in protection of any of his personal interests. *Heckman v. Warren,* 124 Colo. 497, 238 P.2d 854, 859 (1951). This Colorado case was in the context of whether a volunteer employee was subject to the provisions of the Colorado Workman's Compensation Act. However, the *Heckman* case did not shed any particular light upon the specifics of the determination of a gratuitous employee as opposed to a mere volunteer under Colorado law.

In *Severinson v. Nerby,* 105 N.W.2d 252 (N.D.1960), the Supreme Court of North Dakota adopted the definition of a volunteer from Colorado's *Heckman* case, 238 P.2d at 859, stating that if the plaintiff was a mere volunteer and undertook to assist in a project without invitation and without contractual obligation to do so, the defendant would not be liable for injuries sustained by him unless the defendant was guilty of gross negligence, willfulness and wantonness.

The Supreme Court of West Virginia addressed this issue in *Davis v. Fire Creek Fuel Co.,* 144 W.Va. 537, 109 S.E.2d 144 (1959). There, the plaintiff brought an action for personal injuries sustained while performing defendant's work and the question was whether the Plaintiff was a mere volunteer or a gratuitous employee. The court held that several elements should be considered to determine whether the plaintiff was an employee or merely a volunteer at the time of the injury. The request or engagement of the individual is only one of the elements to be considered. Other elements of equal importance were compensation and power of discharge. The court held that the most important element to consider was the right or power of the defendant to control the actions of the individual in the manner in which he conducts the work.

■ If there is a conclusive test to determine whether the relation of master/servant or employer/employee exists, that test turns on a determination of the right to control. 56 C.J.S. Master and Servant, § 2. The relationship of master and servant or employer and employee is one of contract. As between the parties themselves, at least, there must be something to indicate on the part of the supposed master or employer that the supposed servant or employee is to act for him subject to his control, and such supposed employee or servant must act or agree to act in the other's behalf. 56 C.J.S. Master and Servant, § 1; 35 Am.Jur. Master and Servant, § 8.

■ This Court agreed with the court in *Davis,* 109 S.E.2d at 149–50, regarding the elements to consider in determining whether a master/servant relationship exists. These elements are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power of dismissal, and (4) the power of control of the servant's actions. Where all these elements co-exist, a person is a servant and the person who engaged his services is a master. This Court agreed that the power of control is the most significant of these elements.

Based upon the case law set forth above, this Court concluded that the Plaintiff had only presented sufficient evidence that this was a gratuitous undertaking and that Dr. Cottam had agreed to engage in the project. There was no evidence of payment of wages or other consideration, save Dr. Cottam's own personal desire to contribute to the project since the Texas group had arranged the vacation for him and his wife. He had no relationship with the Defendant, his contributions were totally voluntary, and there was no invitation by the Church or request on their behalf that he assist in the project. The only condition of his use of the camp was the payment of the minimum daily cost of $4.00 per person. There was not a scintilla of evidence that the Church had any power to dismiss Dr. Cottam with regard to this undertaking.

Finally, as to the key element of control, the Court determined that there was no showing that the First Baptist Church of Boulder had any control over the manner in

which the project was accomplished. Notwithstanding the fact that First Baptist suggested the general parameters of the project, it exercised no supervision or control over the project or over the individuals involved.

Based upon these determinations, the Court concluded a directed verdict was appropriate for Plaintiffs' failure to prove a prima facie case of an employer/employee relationship between Dr. Cottam and the First Baptist Church of Boulder. But, although it is within the Court's power to direct a verdict where there is a complete absence of evidence on an issue, such power must be exercised with great restraint. *United States v. Vahlco Corp.*, 720 F.2d 885, 889 (5th Cir.1983). The better practice is not to take the case away from the jury, but to grant a judgment notwithstanding the verdict, if appropriate, after the jury has returned its verdict. *Flannery v. Pres. & Dir. of Georgetown College*, 679 F.2d 960, 962 (D.C.Cir.1982); *Tackett v. Kidder*, 616 F.2d 1050, 1052 (8th Cir.1980). Generally, it is in the best interests of the efficient administration of justice for a trial judge to refrain from considering a motion for directed verdict in favor of deciding a motion for judgment notwithstanding the verdict. *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 166 n. 2 (2d Cir.1980). Where a motion for directed verdict is made at the conclusion of the plaintiff's case, it is within the discretion of the court to grant it, but it is a better practice to defer until both sides have rested and it is desirable in appropriate cases to refrain from directing a verdict and consider the matter as a judgment notwithstanding the verdict. *Mattivi*, 618 F.2d at 166 n. 2.

Therefore, the Court submitted the Plaintiffs' first and third claims to the jury, inviting a motion for judgment notwithstanding the verdict. A verdict was obtained in favor of the Plaintiffs and the motion for judgment notwithstanding the verdict is now before the Court. *See* transcript of proceedings in open court November 20, 1990, commencing at 12:20 p.m.

**II.** As to Plaintiffs' second claim for relief (the allegation that the Plaintiff was an independent contractor and therefore was owed certain duties by the Defendant), the Court concluded that there was no evidence that the Defendant selected the Sunday School class as an independent contractor and no evidence that the Plaintiff was personally selected. The Court noted that an independent contractor is defined as one who contracts with another to accomplish a result using his or her own rather than the other's methods with respect to the conduct involved and the performance of the work. Other than the result of the work, an independent contractor is not subject to control of the person engaged.

The Court determined that to be selected as an independent contractor there must be some agreement between the parties. There was no indication in the evidence that the church had in any way intended an arrangement with the Sunday School class or Dr. Cottam individually to undertake a particular job. The Court concluded that Dr. Cottam had no obligation to participate in the undertaking except the personal obligation he felt to his church group. The Defendant did not condition the Sunday School class outing upon the accomplishment of any particular work and did not select the people, save perhaps Mr. Chambers, who was doing the work on a volunteer basis. The church planned the general project, but there were alternatives available to the church group and to Dr. Cottam. Mr. Chambers and the group, including Dr. Cottam, selected the project in question. Defendant did not know in advance which alternative the volunteers would select. There was no evidence of negotiations between the church and Dr. Cottam for any contract. Even assuming there was some independent contract between the Defendant and Mr. Chambers, Dr. Cottam was not selected by Mr. Chambers to participate. Dr. Cottam volunteered. Dr. Cottam had not planned to participate because he had other plans for the day in question. He voluntarily cancelled those plans and agreed to join the project. Finding the evidence insufficient

**1440**

to support the second claim, the Court directed a verdict on the second claim for relief.

## CONCLUSIONS AND ORDER

After reviewing the motions before the Court, the briefs submitted by the parties, the cases relied upon by the Court at the time of the motion for directed verdict, the evidence presented at trial, and treating the evidence in the light most favorable to the verdict returned by the jury, the Court determines that the evidence is not substantial enough that a jury could properly find a verdict for the Plaintiffs. The Court concludes, as it did at the conclusion of the Plaintiffs' evidence, that there is no evidence substantial enough to support the verdict herein and the Defendant's Motion for Judgment Notwithstanding the Verdict is hereby GRANTED.

Pursuant to Fed.R.Civ.P. 50(c), the Defendant's Motion for New Trial is GRANTED for the same reasons set forth in this Order.

In light of the Court's ruling on the Motion for Judgment Notwithstanding the Verdict and the Motion for New Trial, the Motion for Amendment of Judgment is DENIED.

ACCORDINGLY, IT IS ORDERED, ADJUDGED, AND DECREED that judgment will enter in the within action on all claims of the Plaintiffs in favor of the Defendant and against the Plaintiffs, each party to bear their own costs and expenses. It is further ORDERED that the Clerk of this Court enter judgment forthwith in accordance with this Order.

DONE AND ORDERED.