**DEPARTMENT OF MENTAL HEALTH, State of Missouri, Appellant,**

v.

**CONTINENTAL SECURITY LIFE INSURANCE COMPANY, Appellant,**

Missouri Life & Health Insurance Guaranty Association, Ted Sanditz, Steve Bledsoe, Mary K. Holdgraf, Thomas Ittner, Robert J. Banstetter, Bryan Cox, Robert O. Fleckenstein, Robert C. Corn, Stephen S. Duncan and William M. Symon, Respondents.

**No. WD 45373.**

Missouri Court of Appeals, Western District.

May 26, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 30, 1992.

Application to Transfer Denied Sept. 22, 1992.

William L. Webster, Atty. Gen., Lee Vardell, Asst. Atty. Gen., Jefferson City, for Department of Mental Health, State of Mo.

Jeffrey P. Ray, William R. Price, Jr., Kansas City, for Missouri Life & Health Ins. Guar. Co.

Ronald R. McMillin, Dana L. Frese, Jefferson City, for Continental Sec. Life Ins. Co.

Before LOWENSTEIN, C.J., and BERREY and SPINDEN, JJ.

LOWENSTEIN, Chief Judge.

The underlying question in this suit for declaratory judgment involves the responsibilities of the Missouri Life and Health Guaranty Association (MIGA) under §§ 376.715 .758, RSMo Cum.Supp.1991, to the owner-policyholder of a group policy issued by an insolvent insurance company. The policy in question is held by the Missouri Department of Mental Health on behalf of its patients, and gives the patients the right to convert the policy to an individual policy upon leaving the care of the Department. When the issuer, Continental Security Life (CSL), was declared insolvent in 1989, the majority of the premiums on the individual patients were paid-up, resulting in nearly $14,000,000 in benefits due DMH's patients upon their deaths. The appellant, the Department of Mental Health (DMH), on behalf of the individuals in the group, demands that respondent MIGA reinsure, replace or find substitute insurance coverage for the group death-benefits policy DMH bought from CSL, under §§ 376.715 .758, RSMo Cum.Supp. 1991.

CSL was formed sometime in 1981. In May, 1981, DMH found it could utilize federal funds received by patients under the care of the mental health agency to fund no-cash value life insurance on the lives of those patients. Each policy was for $2000 and payable to the patient's estate; the sole purpose was to pay burial expenses of persons who died in the custody or the care

of DMH. Under a stipulation which comprises the fact scenario, on January 27, 1982, DMH and CSL entered into a group contract, which was renewed in September, 1988. Under this contract DMH was the owner and could act on behalf of any person in the group. As per the policy, each person could convert to an individual policy on his or her being released from DMH, although the estate could not be replaced as the beneficiary, even if the person was no longer committed to the Department. The policy was therefore a "whole-life" policy, in that it could be paid-up years before the claim would come due upon the insured's death. Normally, group life policies are "term-life," with the policyholder paying members' premiums on an annual or semi-annual basis, and rights of conversion, once exercised, giving the individual the right to continue making regular premium payments. On October 20, 1988, a petition for receivership on behalf of CSL was filed. On July 7, 1989, the Order was entered. On August 31, 1989, CSL's receiver sent a letter to DMH stating that the policy was terminated immediately since claims after August 20, 1989 (45 days for CSL's being placed in receivership for liquidation) could not be paid. The patient certificate holders on whose behalf DMH has brought this suit are patients who were in the system on the date of insolvency; 7,490 persons in this group had fully paid up insurance (cost $2,935,373), while 693 patients had partially paid insurance (cost $119,951). The policy could be terminated by CSL on any "premium due date."

CSL, MIGA, and its board were made party defendants in DMH's declaratory judgment action. DMH's petition prayed for:

* MIGA to return unearned premiums to "client's of DMH formerly covered by group policy ..."
* MIGA to provide replacement coverage under § 376.724(5).
* MIGA to fund reserves of a replacement policy.
* MIGA "should be required to provide proper notification" to DMH.

DMH makes no requests for any *former* patient nor shows that any of the remaining patients could *not* qualify for an entirely new group policy acquired by DMH.

CSL filed a motion to dismiss, but stayed in the suit and has appealed along with DMH. The respondent is MIGA due to the trial court's entering summary judgment in its favor.

In ruling that MIGA had statutory authority to terminate the group policy without returning "unearned premiums or finding other insurance for DMH" the court ruled:

1) the individual directors of MIGA could not be personally sued, only the association itself. Section 376.715. This correct ruling has not been appealed.

2) The Missouri Act does not contemplate a "self-executory conversion privilege" to allow persons still in a group to convert to individual policies and thus eligible to receive substitute coverage from MIGA.

3) MIGA was only obligated to pay claims for forty-five days after CSL's going into receivership on person's still in DMH control (the only persons involved in this suit, not patient's who had been previously released).

4) The notice of termination to DMH met statutory muster.

5) Neither the act nor the CSL policy gives any remedy calling for a return of unearned premium to DMH, the policyholder.

The Missouri statutes setting up a guaranty association were adopted almost without change from the 1985 revised national act. In one form or another, forty-seven states have guaranty acts such as exists in Missouri. As originally adopted in 1970, by the National Association of Insurance Commissioners, and as applicable to the facts in the case at bar, the purpose of an insurance guaranty association is to protect covered persons against failure of performance of contractual obligations due to the insolvency of the carrier issuing the policy. *See* Dunham & Kinney, "Life and Health Insurance Guaranty Associations," Insurance Company Solvency 277–372, Practising Law Institute Course Handbook (1991), §§ 376.715–758 RSMo.1986; *Clements v. Pittman*, 765 S.W.2d 589, 590 (Mo. banc 1989). To protect policyholders and benefi-

ciaries, MIGA is required to pay benefits and provide coverage, with limitations, to those whose insurance companies become insolvent. MIGA in effect steps into the shoes of the insolvent insurance company. To cover the cost of benefits and continued coverage, the Guaranty members are subject to an assessment, based upon the amount of premiums they write in the state that year. Unfortunately for the task of interpreting the finer points of the enabling act, there is a paucity of law in this state and elsewhere on the questions presented here as to the duties of a state guaranty association upon the insolvency of a company insuring a group with life insurance. Most judicial pronouncements cover the constitutionality of statutorily created associations, recovery of attorney fees and subrogation. Spencer, "Obligations of Guaranty Associations," Insurer Insolvency Revisited 535–543, ABA National Institute (Dec.1989).

Before addressing the points on appeal the controlling statute governing MIGA's responsibility is discussed. Under § 376.-715.2, an association of insurers is created "to pay benefits and continue coverages as limited herein, and members of the association are subject to assessment to provide funds ..." § 376.715.3. The core of the MIGA act, controlling MIGA's actual responsibilities to the insured, is set out in only one section, § 376.724, which covers both impaired and insolvent carriers as well as group life and individual life policies. Those sub-sections pertaining to MIGA's duties to group life policies, § 376.724.4 and .5, are set out in full (emphasis added):

4. (1) If a member insurer is an insolvent insurer, the association shall, in its discretion, either;

(a) *Guarantee, assume or reinsure,* or cause to be guaranteed, assumed or reinsured, the policies or contracts of the insolvent insurer; *or*

(b) *Assure payment* of the contractual obligations of the insolvent insurer; and

(c) *Provide such moneys,* pledges, guarantees, or other means as are reasonably *necessary* to discharge such duties; *or*

(2) *With respect only to life and health* policies, *provide benefits and coverages in accordance with subsection 5* of this section.

5. When proceeding under subsection 2 or 4 of this section, the *association shall,* with respect to only life and health insurance policies;

(1) *Assure payment of benefits* for premiums identical to the premiums and benefits, except for terms of conversion and renewability, that would have been payable under the policies of the insolvent insurer, *for claims incurred:*

(a) *With respect to group policies,* not later than the earlier of the next renewal date under such policies or contracts or *forty-five days,* but in no event less than thirty days, after the date on which the association becomes obligated with respect to such policies.

(b) With respect to individual policies, not later than the earlier of the next renewal date, if any, under such policies or one year, but in no event less than thirty days, from the date on which the association becomes obligated with respect to such policies;

(2) *Make diligent efforts to provide all known* insureds or *group policyholders* with respect to group policies *thirty days notice of the termination of the benefits provided;* and

(3) With respect to individual policies, make available to each known insured, or owner if other than the insured, and *with respect to an individual formerly insured under a group policy who is not eligible for replacement group coverage, make available substitute coverage* on an individual basis in accordance with the provisions of subsection 6[1] of this

---

1. Sub-section 6 reads:

6. (1) In providing the substitute coverage required under subdivision (3) of subsection 5 of this section, the association may offer either to reissue the terminated coverage or to issue an alternative policy.

(2) Alternative or reissued policies shall be offered without requiring evidence of insurabili-

ty, and shall not provide for any waiting period or exclusion that would not have applied under the terminated policy.

(3) The association may reinsure any alternative or reissued policy.

section, *if the insureds had a right under law or the terminated policy to convert coverage to individual coverage* or to continue an individual policy in force until a specified age or for a specified time, during which the insurer had no right unilaterally to make changes in any provision of the policy or had a right only to make changes in premium by class.

As this court reads § 376.724, MIGA has three options: 1) it may assume/reinsure/guarantee the defunct policy, 2) it may pay the claims the defunct policy would have paid, or, 3) if the policy is a life/health policy, it may provide benefits/coverage under the above sub-section 5. If MIGA does not wish to assume the policy or take over payment of claims under the policy with no end in sight, which is true of a whole-life, paid-up policy, it may follow option three. It is clear that MIGA intended to follow sub-section 5, and therefore DMH's rights are to be determined under that sub-section.

### I.

The trial court held, and DMH disagrees, that sub-section 5 only requires MIGA to pay claims on group policies for up to forty-five days, without any further obligation to provide a substitute policy as suggested by the remainder of sub-section 5. Reduced to the bare essence, DMH's argument is that MIGA must provide substitute coverage for the individuals DMH currently has in its care, and which hold paid-up certificates of insurance, because sub-section 5 requires this "if the insureds had a right under law or the terminated policy to convert coverage to individual coverage," § 376.724.5(3). DMH also argues that because the greater bulk of the group certificates were paid-up or "whole," the Act requires that they be entitled to be treated as individual policies under § 376.724.5(3).

It is true that § 376.697(8), RSMo 1986, requires a conversion clause in all group insurance, so that when an individual ceases to be a member of the group, he or she may convert the coverage from a group certificate to an individual policy, and begin paying their own premiums. Further, it is true that DMH's group policy did allow an individual due to "termination of member-ship in the class" to convert to "an individual policy of life insurance." DMH states that since the right to convert existed, MIGA must then follow sub-section 5(3) and "make available substitute coverage." This reasoning cannot be adopted, however, since it leaves out the initial language of sub-section 5(3). The sub-section creates two classes of life insurance policies: one is "individual policies," while the other is "an individual formerly insured under a group policy *who is not eligible for replacement coverage* . . . if the insureds had a right . . . to convert . . . ," § 376.724.5(3) (emphasis added).

■ This court holds that MIGA only had a duty to provide substitute coverage if those individuals DMH makes claim for fit into either of the above classes. Therefore, the certificate holders insured under CSL's defunct policy must be ineligible for a replacement policy taken out by DMH, and have had a right to convert CSL's policy to an individual policy.

Looking at the facts of this case, it is clear that DMH did not seek new coverage. There is nothing in the stipulation to show that any individual in the care of DMH at the time of CSL's insolvency was refused insurance by a new carrier. Similarly, the record is bare of any showing of patients who left the care of DMH, are no longer part of the group, and therefore ineligible for a new group policy. Therefore, DMH has not shown that any patient it makes claim for fulfills the requirements of sub-section 5(3), and to which MIGA therefore owes the duty of making available substitute coverage. MIGA paid claims on the group policy for forty-five days. With absolutely no evidence that any of DMH's patients would not be eligible or had been turned down for a new group policy, 5(3), there is no statutory language to require MIGA to do more than it did. However, see the discussion *infra*, regarding MIGA's duty to give 30 days notice of termination of benefits, under § 376.724.5(2).

### II.

■ DMH directs its next point of error at the trial court ruling which, in effect,

put the burden on the Department to show as the owner of the policy any individuals that were ineligible for replacement coverage. Section 376.724.5(3). DMH asks this court to give MIGA the burden to show which of the some 7900 patients for which DMH was responsible were unable to qualify for a new group policy, and so would have been left without coverage after CSL's insolvency. Even under the best of circumstances this burden should not be on a guaranty association. Under these facts, where DMH made no attempt to replace the coverage it lost, it would be well nigh impossible for MIGA to now figure out which patients might have been excluded from a new policy, say for health reasons. MIGA cannot be charged with determining which individual group members might have been left out of a new policy in order to determine DMH's legal rights in this suit, when in fact no new policy was acquired. Nowhere in §§ 376.715–758 is MIGA given this burden, and the trial court correctly found that DMH, not MIGA, had not produced the necessary evidence of ineligibility.

Additionally, this argument overlooks that the substitute coverage provision really protects an individual rather than a group policyholder, once MIGA follows its third option under § 376.724.4, RSMo Cum. Supp.1991. The scheme or purpose of the model act, and the Missouri act, is to give the owner of the group policy, often an employer, forty-five days to find another company to insure the group members, or employees. The guaranty association picks up the tab for claims, and allows this time to be used by a somewhat sophisticated insurance buyer to get a new company. This particular part of the law, sub-section 5(3), gives to a person who has an individual policy, or an "individual formerly under a group policy who is *not eligible* for group coverage," substitute individual coverage, (emphasis added). Nowhere does the statute, once MIGA follows its third option, protect a group policyholder beyond the notice and claim paying provisions. Therefore, DMH bears the burden of showing to which individuals MIGA does owe a responsibility. That DMH cannot do so is per-

haps because former patients, discharged at the time of insolvency and possibly ineligible for replacement coverage, were not the subject of DMH's declaratory judgment against MIGA.

The point is denied.

### III.

MIGA had no duty to find or fund replacement coverage. This is not a harsh or unfair result. The statute places limitations upon MIGA's duties regarding group policies. MIGA has several options, one of which is to proceed under sub-section 5 of the statute. This allows MIGA to *not* totally assume liability on group life and health policies, but rather to pay claims only for a certain period of time, and to make available substitute coverage for certain individuals fulfilling certain requirements. The plain language of the statute does not protect group policyholders, but rather individuals and those former group members who need protection. Here, using federal funds received by its patients, DMH paid these life policies in full. Under DMH's interpretation of the statute, MIGA should be solely responsible for paying claims on over 8000 policies without receiving any premiums. This is precisely the situation the 1985 amendments to the Model Guaranty Act anticipated. As adopted in this state in 1988, the new language effectively gives MIGA the option to avoid further involvement in group life and health policies after paying claims for the statutory period. This enables MIGA to "avoid wholly uneconomic policies," while granting the policyholder a measure of protection. Bromly, "Life & Health and HMO Guaranty Funds—An Overview of Recent Developments," Insurer Insolvency Revisited, 457, 469–70, ABA National Institute (Dec.1989). Such is this case. An individual policyholder of life or health insurance is in a far worse economic position to shop around for replacement coverage than is the more sophisticated group buyer. Hence, the statute is skewed to demand more help by the guaranty association to individual persons left stranded by an insolvent carrier.

■ Although statutes creating guaranty associations are to be liberally construed to protect against insolvent insurers, *Clements v. Pittman*, 765 S.W.2d 589, 590 (Mo. banc 1989), the courts cannot construe the association's responsibility to be anything beyond the clear wording of the legislative enactment. *Ursin v. Ins. Guaranty Assoc.*, 396 So.2d 400, 403 (La.App.1981), *aff'd Ursin v. Ins. Guaranty Assoc.*, 412 So.2d 1285 (La.1981); *H & B Const. v. Louisiana Ins. Guaranty Assoc.*, 580 So.2d 931, 935 (La.App.1991). This point is denied.

## IV.

■ As recounted earlier in this opinion, DMH prayed for a "return to the clients (patients) ... the unearned premiums paid to ..." CSL. Again, as with all relief requested by DMH, the claim for premiums was to MIGA, not CSL the insolvent insurer. The trial court ruled in favor of MIGA and DMH does not appeal this portion of the judgment, although CSL raised the issue in its appellate brief. Though unnecessary to the issues on appeal, and constituting *dicta*, this opinion endorses the ruling. Section 376.724.5(1) refers only to "claims" incurred. Missouri did not define the term. The legislature did not adopt a definition from the Model Act which defines a "covered claim" as "... an unpaid claim, including one for unearned premiums ..." Without some action by the legislature on so defining "covered claims," it is unlikely unearned premiums would be deemed by the courts as MIGA's responsibility. It would further appear that legislative acts which split life and health guaranty laws from those dealing with other kinds of insurance like homeowner's will provide guaranty for unearned premiums in the others, but specifically delete such sums from covered claims in the life field. *See e.g.*, Washington Insurance Guaranty Association Act, § 48.32.030(4), West's RCWA 1976 and § 48.32A.030 West's RCWA 1990. *But see* West's California Insurance Code §§ 1063.1 and 1067.04 (1991); and *Arizona Ins. Guaranty Assoc. v. Humphrey*, 109 Ariz. 284, 508 P.2d 1146 (1973); *Bond v. Cartwright Little League, Inc.*, 112 Ariz. 9, 536 P.2d 697 (1975).

■ Also relegated to the status of *dicta* is this court's view of the trial court's judgment which held that the MIGA legislation does not contemplate a suit such as this against its individual directors and general counsel. This court concurs. Under § 376.734.1(2), MIGA, as a nonprofit legal entity, § 376.720, may sue or be sued. Nothing in this act, including the method of selection of the directors, § 376.722, authorizes them to be individually liable in this type of suit.

As if not already rife with *dicta*, the court feels constrained to write on the trial court's conclusion that the notice to DMH by CSL's receiver "satisfied the requirements of Section 376.724.5(2)." For some unfathomable reason DMH chose not to question this portion of the judgment in this court. Still, the statute in clear language states MIGA, "shall ... [m]ake diligent efforts to provide all known insureds or group policyholders with respect to group policies thirty days notice of the termination of benefits provided ..." § 376.724.5(2). Absent from the law is any remedial or penalty provision.

MIGA's home base in Jefferson City; DMH, one of this state's largest agencies is in Jefferson City; CSL during its short life was headquartered in Jefferson City; DMH held CSL group policy no. 6, with over 8,000 members; and, finally, CSL's insolvency was ordered on July 7, 1989. Nevertheless, according to the stipulation of facts, MIGA, who had the responsibility to notify group policyholders, never said anything to DMH. A letter *dated* August 31, 1989, from CSL's receiver told DMH no claim after August 20, 1989 would be paid by MIGA, because MIGA had no responsibility past the 45 day period (July 7 to August 20).

■ This was not the diligent effort required of MIGA. The purpose of this act is to allow some sort of breathing period for an entity in DMH's position to acquire another policy, while member's claims are paid for forty-five days. However, instead of getting a new policy, DMH brought this suit. There is no showing by the Depart-

ment of any attempt to secure new coverage. There has been no mention by DMH of any claims arising after the forty-five cut off, or for that fact for 30 days following MIGA's statutorily imposed duty to pay claims. To use the parlance of basketball, there was no harm so no foul will be called on MIGA without legislative action on this part of the statute regarding notice. Where, assuming contrary facts, MIGA does not make a diligent effort to give 30 days notice of termination of payment of claims, and the policyholder makes a bona fide effort to get a new policy then MIGA's obligation should be to continue the benefits and pay claims up to a maximum of 30 days after actual receipt of notice. This way there would be no gap in coverage, and the purpose of the notice provision fulfilled.

## V.

As mentioned earlier, CSL was sued as a party defendant, remained in the suit, subsequently had judgment entered against it and DMH, and has filed an appeal in this court. CSL contends that the trial court erred in entering judgment against it because the motion for judgment filed by MIGA did not seek any relief against CSL. In fact, DMH's amended petition did not even ask the trial court to declare any rights or duties as to CSL. CSL initially filed a motion to dismiss but subsequently filed an answer and signed the stipulation of facts on which the case was submitted. In its judgment the trial court overruled the motion to dismiss and entered judgment in favor of MIGA and its directors and against DMH and CSL. Costs were taxed against DMH. Since neither the amended petition nor MIGA's motion for judgment requested relief against CSL, the portion of the judgment entered against CSL is superfluous and is vacated. CSL, which was an unwilling defendant in the DMH suit against MIGA, had no power to request of or do anything for the other parties. Somehow on appeal, CSL, and not DMH which abandoned the point, asked for a return of unearned premiums to DMH. This is denied. Again as *dicta*, this court questions why CSL, a company in receivership, was named a party in this declaratory judgment action. A more puzzling question is why CSL, which is unable to pay claims and is in receivership, did not more vigorously pursue a ruling on its motion to dismiss. Counsel for CSL stated in oral argument that its motion to dismiss was overruled at the beginning of the lawsuit but the only ruling reflected in the record was that made in the declaratory judgment.

DMH does not question the assessment of costs against it, and this court assumes this is because DMH believes § 514.190, RSMo 1986, applies and allows costs to be taxed against the state in a case such as this.

The judgment as to DMH is affirmed, and reversed as to CSL. Costs are assessed against DMH.

All concur.

